Filed 1/14/25  P. v. Tyner CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B329967 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA120629) |
| v. | |
| CHAUMON TYNER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Ana R. Duarte, Deputy Attorney General, and Kenneth C. Byrne, Supervising Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted Chaumon Tyner of first degree murder, animal cruelty, and arson, and the trial court found true the allegation Tyner had a prior serious felony conviction. Tyner argues that the trial court deprived him of his right to represent himself and that his trial counsel provided ineffective assistance. We conclude that Tyner's three motions to represent himself were untimely and that the trial court did not abuse its discretion in denying them. We also conclude that the record does not show why counsel for Tyner acted or failed to act in the ways Tyner asserts were ineffective and that there may have been tactical reasons for the choices made by Tyner's counsel. Therefore, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *Tyner Kills Ronnie Wall in Her Apartment and Sets Several Fires*

Tyner met Ronnie Wall through an online dating site. They had been dating for about six weeks when Wall's son visited her on Saturday, March 16, 2019, at her apartment in Pomona. After spending the day with her son, Wall drove him to the train station in Claremont, where she dropped him off and picked up Tyner, who claimed to live in Venice. Tyner and Wall intended to spend the weekend together.

The following Monday morning, March 18, 2019, firefighters responded to a call from Wall's apartment building, where a sprinkler system had been activated. When the fire captain entered Wall's apartment he saw the living room in

disarray, a hammer on the ground with blood on it, and burnt carpet. The fire captain found Wall's body in the bathroom with her dog beside her, both dead. There was a pair of scissors next to Wall's body. The fire captain said bed sheets had been removed from Wall's bed and "gathered up" next to Wall, where they were partially burnt. Firefighters pronounced Wall dead at 6:50 a.m.

Police officers responded to the scene and found no sign of forced entry. There was blood on the walls, carpeting, clothing, and other items in the apartment, including a pair of men's shoes. A trail of blood led from the couch in the living room into the master bedroom and into the bathroom where Wall was found. Wall's cell phone was missing, and her car was not at the apartment complex. Surveillance video showed Wall's car leaving the complex at 5:54 a.m., Monday, March 18, 2019.

A fire investigator found three fires were intentionally set in the apartment: one in the kitchen, one in the bathroom of the master bedroom, and one, the largest of the three, in the living room. A trail of towels, sheets, and clothes from the living room to the bedroom and into the bathroom provided fuel for the fires. The clothes included a pair of white jeans. The living room fire burned from the living room into the bedroom, but another fire set in the bedroom or bathroom burned the material extending into the bathroom and Wall's leg. The fire investigator found an empty bottle of cleanser that looked like it had been used as an accelerant for the fires.

The coroner determined Wall died from two fatal stab wounds, one to her neck and one to her chest. In total, the coroner identified 18 "sharp force injuries," numerous "superficial sharp force wounds," and "multiple blunt force blows." The latter

included "a lot of injuries to the head," including an injury to Wall's brain that indicated "a lot of force being applied to striking her head." The coroner also found burns on Wall's body, which could have occurred before Wall's death, and fractures in her cervical spine. Wall's dog had a severed spinal cord caused by blunt force trauma.

B.     *Police Investigate and Arrest Tyner*

Wall's son told police detectives that Wall spent the weekend with Tyner. Detectives located Tyner at a group home in Inglewood, arrested him, and recorded an interview with him.[1] Tyner told the detectives that he was dating Wall and that he spent weekends with her. Tyner said Wall picked him up at the train station on Saturday, March 16, 2019, at approximately 5:00 p.m. As they drove to her apartment, Tyner said a rock thrown by a group of teenagers on a street corner struck him near his eye. Tyner said that he was "bleeding everywhere" and that Wall treated his injury in her apartment with cotton swabs and ointment. Tyner said he told Wall that he still felt unwell, and Wall offered to drive him home. He showered at Wall's apartment and changed out of his bloody clothes, including a pair of white jeans, which Tyner said Wall offered to clean for him. Tyner said the last time he saw Wall was Saturday evening in front of his building at 6:40 p.m.

Tyner told police Wall sent him "a couple of texts" after she took him home. Tyner said that, in the exchange of text messages, he told Wall that he liked her a lot, but that she needed to make her health and her son her priorities. Tyner said

---

[1]     The prosecutor played a recording of the interview at trial and provided the jurors a copy of the transcript.

4

that they did not break up, but that Wall said she would not call him anymore.

Tyner told the detectives he spent Saturday night at his residence, leaving only to get food. When the detectives told Tyner they had evidence that he missed the group home's night checks and that his roommates said he was not there Saturday night, Tyner insisted he was. Tyner claimed to have spent most of Sunday and Sunday night with a friend watching basketball. He said they watched a game between the Boston Celtics and the Philadelphia 76ers Sunday afternoon and a Los Angeles Lakers game that evening. The next morning, Tyner said, he took a bus to the trade school where he was enrolled. Tyner's friend told the detectives that Tyner was not with him that Sunday, but that he watched a game with Tyner the following weekend. The detectives also determined that neither the Celtics nor the 76ers played on Sunday, March 17 and that the Lakers played that day at 9:00 a.m., Pacific Daylight Time.

Cell phone evidence also contradicted much of Tyner's account.[2] Records placed Tyner's phone at Wall's apartment building from 7:03 p.m., Saturday, March 16, 2019, until 5:53 a.m., Monday, March 18, 2019, one minute before Wall's car left her apartment complex. On Monday morning, March 18,

---

[2] The evidence introduced at trial included cell phone tower data and "Google location history," which is based on global positioning satellites and Wi-Fi data associated with a particular email address. (See generally *In re Google Location History Litigation* (N.D.Cal. 2021) 514 F.Supp.3d 1147, 1155 [denying a motion to dismiss a putative class action alleging Google "gather[s] location data 'almost incessantly' and even when a user is not interacting with [a Google app]"].)

2019, Tyner's phone connected to several cell towers along the freeway between Pomona and the area near Tyner's trade school in Los Angeles, which was near where police found Wall's car. The last connection to a cell tower from Wall's phone was in an area between Wall's car and Tyner's trade school.

Detectives also extracted cell phone text data from Tyner's phone. Tyner and Wall texted each other multiple times leading up to his arrival at the Claremont train station. There were no text messages between their phones from 4:25 p.m. to 9:42 p.m., Saturday, March 16, 2019. Beginning at 9:43 p.m., Tyner's and Wall's phones exchanged six text messages. In one of them, Tyner told Wall that he "'really like[d]'" her, but that she needed to get some help. Wall responded she was, but Tyner said, "'That's cool; but I'm sorry.'" At 9:55 p.m., Wall responded, "'Like I said, I knew you wouldn't understand. Fine. I wouldn't call you anymore.'" Cell phone records placed Tyner's phone at Wall's apartment building during this exchange, but investigators could not identify the location of Wall's phone.[3] At 10:12 p.m., Wall's phone made an outgoing call to Tyner's phone, with both phones connecting to the cell tower near Wall's apartment. Tyner then sent several texts and made two outgoing phone calls to other women from the same location.

On Sunday morning, March 17, 2019, Tyner sent a text message to a woman telling her he got a cut over his eye from a welding accident. He sent a text to another woman telling her that he could not meet her for lunch because he got stuck "'in traffic'" while taking groceries to his brother and his family in Palmdale. That evening Tyner had two lengthy cell phone

---

[3] At trial the prosecutor suggested Tyner created this text exchange to support an alibi.

6

conversations. For all these texts and calls, Tyner's phone connected to a cell tower near Wall's apartment.

Surveillance video from Tyner's trade school showed him arriving there between 7:00 a.m. and 8:00 a.m., Monday, March 18. The video also showed Tyner with a gash over his right eye. Tyner's instructor asked him if he was "okay" and "what happened." Tyner said he thought a rock hit him when he got off the train. The instructor suggested Tyner get stitches, and Tyner left for the hospital. When Tyner returned to school, two classmates noticed his hand was swollen. He said someone slammed a car door on his hand in a separate incident.

The police also obtained DNA evidence from items in Wall's apartment. A swab from the handle of the scissors found next to Wall's body included a mixture of DNA profiles consistent with Tyner's and Wall's DNA. The blade of the scissors contained DNA from only Wall. Fingernail clippings from Wall's left hand included DNA from Wall and Tyner.

C. *A Jury Convicts Tyner, and the Trial Court Sentences Him*

The People charged Tyner with murder (Pen. Code, § 187, subd. (a)),[4] animal cruelty (§ 597, subd. (a)), and arson of an inhabited structure (§ 451, subd. (b)). People alleged that Tyner personally used a deadly or dangerous weapon in committing the murder (§ 12022, subd. (b)(1)), that he had a prior felony conviction that was a serious or violent felony within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and a serious felony, within the meaning of section 667, subdivision (a)(1), and that he served three prior

---

[4]     Undesignated statutory references are to the Penal Code.

prison terms within the meaning of former section 667.5, subdivision (b), an allegation the trial court struck during trial.

Before and during Tyner's trial the court denied three requests by Tyner under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) to represent himself and a motion under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) to replace appointed counsel. The jury found Tyner guilty on all counts and found true the weapon allegation. The court found the prior conviction allegation true.

The trial court denied Tyner's motion for new trial based on ineffective assistance of counsel, but struck the enhancement for personally using a deadly or dangerous weapon. On Tyner's murder conviction, the court sentenced Tyner to a prison term of 25 years to life, doubled under the three strikes law, plus five years for the prior serious felony enhancement. On the animal cruelty conviction, the court sentenced Tyner to a consecutive term of eight months, doubled under the three strikes law, and on the arson conviction the court sentenced him to a consecutive term of five years, doubled under the three strikes law (the court struck the prior serious felony enhancement for this conviction). Thus, the court sentenced Tyner to an aggregate prison term of 11 years, four months, to be served before an indeterminate term of 55 years to life. Tyner timely appealed.

# DISCUSSION

A. *The Trial Court Did Not Deprive Tyner of His Right To Represent Himself*

1. *Relevant Proceedings*

a. *Before Trial*

Tyner was arraigned April 22, 2021.  On June 1, 2021 Tyner appeared with his court-appointed counsel, Alexander Sario, before Judge Douglas Sortino for a pretrial conference. Tyner waived his right to a speedy trial.  (See § 1382.)

Tyner waived his speedy trial right several more times, including on September 30, 2021.  At that hearing Sario informed the court that Tyner had requested a copy of the discovery, a request Sario declined.  Judge Sortino said, "Try to work this out," and explained to Tyner why having discovery in the jail could be problematic.  Tyner said, "I understand, but I still want it."  Judge Sortino said, "Talk to Mr. Sario.  He gets to control that."  The court also asked Sario to work with the prosecutor in the event Sario decided to share any discovery with Tyner to ensure identifying information was redacted.

Several hearings later, on April 13, 2022, Judge Mike Camacho held a pretrial conference.  Tyner asked the court for a copy of the discovery in his case.  The court denied the request and told Tyner that he was "not entitled to [his] own personal copy of the discovery."  Tyner said, "I was here six months ago. I talked to a judge, and he ordered the [prosecutor] and my attorney to give me a copy of my discovery.  I have here a writ of mandamus asking you to honor that request."  The court said the

9

writ was not properly before the court and again denied Tyner's request for a copy of the discovery.

After an intervening hearing and another continuance, the parties appeared before Judge Sortino on July 14, 2022. The court set the case for trial on September 6, 2022 (later continued to September 8, 2022). Sario informed the court Tyner believed the court had ordered Sario to provide Tyner a copy of the discovery. The court stated, "I know I would never make that ruling." The prosecutor said he believed Judge Camacho made the ruling Tyner was referring to, but Judge Sortino read the record from the prior hearing where Judge Camacho denied Tyner's request for the discovery. Tyner said, "There was one before that," and Judge Sortino replied, "I don't care what the other judge did . . . . I'm not going to order your lawyer to provide you with discovery. I have never done that, nor will I. That is a decision your lawyer makes for tactical or safety reasons for you of not having discovery floating around the jail." Judge Sortino added, "It's up to the lawyers to make that kind of decision."

### b. *During Trial*

*The first motion.* Judge Camacho presided over the trial. On the morning of September 8, 2022, and before inviting the prospective jurors into the courtroom, the court asked counsel whether there had been any efforts to resolve the case through a plea agreement. The prosecutor said the People offered a term of 51 years to life, and counsel for Tyner said his client would accept 11 years. The court said, "That's clearly not going to happen." After Tyner spoke briefly with his attorney, Tyner said he wanted to represent himself.

The court stated: "Today is the day for trial and a request of that nature should have been made a long time ago. . . . The only possible way I would permit you to represent yourself at this stage is to go forward with this trial . . . without any continuance, because I'm getting the impression from you that your request . . . is a request to delay these proceedings unnecessarily, knowing full well that jurors have been ordered." Tyner said he was not informed the trial was starting that day. The court said that the case had "been lingering . . . for quite some time," but that the court would not interfere with Tyner's right to represent himself if he was ready to proceed. Tyner said that he was not ready and that he would not be ready until he received the discovery and "other pertinent information."

The court denied the request as untimely. The court said Tyner had never indicated any interest in representing himself throughout the history of the case until he saw "jurors waiting in the hallway on the day of trial." The court found Tyner had not made a motion under *Marsden* to replace his appointed counsel. The court said Sario was "an extremely experienced defense lawyer" who understood how to evaluate a case and formulate a trial strategy. The court then invited the prospective jurors into the courtroom.

*The second motion.* Tyner again asked to represent himself later that same day, after jury selection began. Sario informed the court Tyner would be ready for trial the following Monday (September 8, 2022 was a Thursday), and Tyner agreed Sario could continue jury selection that day and Friday. Sario said that he had a "first packet" of discovery ready to share with Tyner and that he could give him the rest of it that weekend. The court said it would consider Tyner's request and address it before swearing

11

in the panel. The court said that the request was still untimely, but that the court was inclined to grant it if the trial could proceed without delay. The court also said Sario could provide Tyner a copy of the discovery packet, so long as sensitive information was redacted to the People's satisfaction. The prosecutor urged the court to consider that much of the discovery was in electronic form and that Tyner would not have access to it from jail or through an investigator (which Tyner didn't have anyway). The court informed Tyner it would consider his ability to "properly prepare," given his limited access to electronic equipment. At the end of the day the court gave Tyner a "*Faretta* waiver" form titled Advisement and Waiver of Right to Counsel (*Faretta* waiver) to review, and Sario gave Tyner approximately 250 pages of discovery.

The next day Sario submitted Tyner's signed *Faretta* waiver and said he would give Tyner the remaining discovery that day. After jury selection, but before the clerk swore the panel, the court returned to Tyner's request to represent himself. As it had the day before, the court found Tyner's motion was untimely. The court also found Tyner's request was equivocal. The court said Tyner's request appeared to be "made in passing out of frustration and anger" after the People rejected Tyner's plea offer. The court explained that "moments before" Tyner made his first request on the morning of trial, the court said a plea agreement was "not going to happen." The court said Tyner "blurted out the uninvited response" that he wanted to exercise his *Faretta* rights. The court found Tyner's request "rash and impulsive" because it immediately followed the failed plea negotiations, Tyner had not (yet) expressed dissatisfaction with Sario, and Tyner had little time to prepare for trial.

12

Sario informed the court Tyner might have said he wanted to fire Sario and hire a new attorney after the last of the pretrial hearings where the court denied Tyner access to the discovery. Tyner said he did. Sario also said that Tyner was a "miss-out" for several pretrial hearings[5] and that he did not speak to Tyner after the trial readiness hearing, which meant Tyner did not have an opportunity to tell him or the court he wanted to represent himself during about two months leading up to trial.

Tyner told the court his decision to represent himself was not made out of frustration. He said that a judge previously told Sario and the prosecutor to "get together, redact [the] discovery, and give it to [him]," but that never happened. Tyner said that he had been trying to get the discovery so he could decide whether to represent himself, but that neither his attorney nor the prosecutor would meet him "even halfway." Now, according to Tyner, he needed the discovery so he could "go over the evidence" himself to "better assist" in his defense. He said that Sario was "doing a decent job" but that, because he was Tyner's fifth court-appointed attorney, Tyner had not had "continuous counsel to help [him] come to a really good decision about this." Tyner claimed that Sario failed to attend a scheduled video conference with him and that he believed trial was not scheduled until September 16. Tyner also claimed he had been trying to get the discovery from Sario for some time. He said the first time he asked Sario for a copy of the discovery, Sario responded, "'I don't give discovery. If you want your discovery, go pro per.'" Tyner

---

[5]     "Miss-out" refers to a defendant who is in custody before trial but is not brought to court for a hearing or other proceeding. (See *People v. Howze* (2001) 85 Cal.App.4th 1380, 1389.)

said he decided at that time to represent himself if Sario would not give him the discovery.

The court found Tyner's frustration appeared to arise not from failed plea negotiations, but from his inability to "get [his] hands on [his] own set of discovery." The court concluded Tyner's request to represent himself was equivocal because it was "not truly" what he desired. The court made a "special exception" to allow Tyner to keep his set of the discovery to be able to assist in his defense.

*The third motion.* The prosecutor expressed concern the court's ruling on Tyner's second motion could be reversed on appeal and asked the court to reconsider Tyner's request to represent himself after Tyner reviewed the discovery over the weekend. The prosecutor, however, also argued Tyner's statements he did not know trial was beginning in early September 2022 did not "ring true" because Tyner was in court and refused to waive time on July 14, 2022, when trial was set for September 6, 2022. The court agreed to consider a renewed request for self-representation the following Monday.

Tyner renewed his request the following Monday, September 12, 2022, and Sario said Tyner was prepared to make an opening statement and to cross-examine witnesses. The court expressed concerns with Tyner's ability to represent himself, given the limited time he had to prepare, and Tyner said he understood the disadvantages of self-representation. The court asked Tyner if he understood he was waiving his right to counsel and would "be on [his] own" if he chose to represent himself. Tyner said he did and, after conferring with Sario, Tyner moved under Code of Civil Procedure section 170.6 to reassign the case to another judge because Tyner did not believe he could get a fair

hearing from Judge Camacho. The court denied the motion as "extremely untimely." (See Code Civ. Proc., § 170.6, subd. (a)(2); *Maas v. Superior Court* (2016) 1 Cal.5th 962, 973 [in most instances, "a disqualification motion cannot be presented after commencement of the trial or hearing"].)

The court said it was prepared to "give in" to Tyner's request to represent himself, but asked Tyner if he "truly desire[d]" to waive his right to counsel and represent himself. Tyner said, "Yes, I do want to go pro per. But if I need counsel, I may need aid of counsel. And that will be from a state-appointed attorney, not someone from the public defender's office or the alternate public defender's office." The court denied Tyner's motion to represent himself as equivocal because it found Tyner was not certain he wanted to waive his right to counsel. The court said Tyner was "requesting counsel in the alternative," which is "not an unequivocal request for self-representation." The court also stated Tyner suggested he was "entitled to standby counsel or some type of co-counsel, . . . which tells the court that he still desires representation and is concerned about his representation in the event he is allowed to proceed in pro per, which means it is not unequivocal . . . ."

When trial resumed, Sario elected to reserve Tyner's opening statement until the defense case. Tyner attempted to renew his peremptory challenge to Judge Camacho and said he had a "conflict of interest" with Sario because Sario was not "doing anything" Tyner asked him to do. After excusing the jury, the court again denied Tyner's oral motion under Code of Civil Procedure section 170.6 and warned Tyner he risked tainting the jury's view of him and his right to be present at trial by making "unsolicited outbursts." Tyner reiterated he had a conflict of

15

interest with his attorney; the court conducted a hearing under *Marsden* and denied Tyner's (implied) request for a different court-appointed lawyer.

    2. *Applicable Law and Standard of Review*

  Under the Sixth Amendment of the United States Constitution, a criminal defendant has a "constitutional right to conduct his own defense." (*Faretta*, *supra*, 422 U.S. at p. 836.) The right to self-representation is independent of the guarantees of the Sixth and Fourteenth Amendments "that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment." (*Id.* at p. 807.) However, "the right of self-representation is not absolute." (*Indiana v. Edwards* (2008) 554 U.S. 164, 171; see *People v. Frazier* (2024) 16 Cal.5th 814, 850 (*Frazier*); *People v. Butler* (2009) 47 Cal.4th 814, 825.) "When a defendant makes a timely and unequivocal request for self-representation, and does so knowingly, voluntarily, and intelligently, a trial court must grant the defendant's request. [Citation.] When a defendant's motion is untimely, the motion is 'based on nonconstitutional grounds' [citation] and it is 'within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se*.'" (*People v. Thomas* (2023) 14 Cal.5th 327, 397 (*Thomas*); see *Frazier*, at p. 852; *People v. Johnson* (2019) 8 Cal.5th 475, 499 (*Johnson*); *People v. Windham* (1977) 19 Cal.3d 121, 124, 127-128, 129, fn. 6 (*Windham*); see also *People v. Lawrence* (2009) 46 Cal.4th 186, 191-192 [while a timely, unequivocal *Faretta* motion invokes "the nondiscretionary right to self-representation," an untimely motion for self-representation does not]; *People v. Bradford*

16

(1997) 15 Cal.4th 1229, 1365 [if a motion for self-representation is untimely, "self-representation no longer is a matter of right but is subject to the trial court's discretion"].) Requiring defendants to file timely motions under *Faretta* "reflects that 'the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.'" (*Johnson*, at p. 499; see *People v. Lynch* (2010) 50 Cal.4th 693, 722 (*Lynch*) ["the purpose of the requirement is 'to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice'"], overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643.)

A "'*Faretta* motion is timely if it is made "within a reasonable time prior to the commencement of trial."'" (*Thomas*, *supra*, 14 Cal.5th at p. 397; see *Johnson*, *supra*, 8 Cal.5th at p. 499.) In determining whether such a motion is timely, "a trial court may consider the totality of the circumstances," including "'not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation.'" (*Johnson*, at p. 500; see *Lynch*, *supra*, 50 Cal.4th at p. 726.) In general, "motions '"made on the eve of trial"'" are untimely (*Thomas*, at p. 397; see *Johnson*, at pp. 499-500), "'extreme,'" and "disfavored" (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1277; see *Lynch*, at pp. 722-723).

The California Supreme Court in *Windham* prescribed the factors the trial court should consider in ruling on an untimely

17

motion for self-representation.  Those factors include the defendant's reasons for the request, the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the length and stage of the proceedings, and the disruption or delay granting the motion might reasonably cause.  (*Windham*, *supra*, 19 Cal.3d at pp. 128-129; accord, *Frazier*, *supra*, 16 Cal.5th at p. 852; *Thomas*, *supra*, 14 Cal.5th at p. 399.)  The trial court need not explicitly consider all the factors, so long as the record contains sufficient evidence to support their implicit consideration.  (*People v. Bradford* (2010) 187 Cal.App.4th 1345, 1354; see *People v. Marshall* (1996) 13 Cal.4th 799, 828 [trial court did not abuse its discretion where the record reflected the court's "explicit or implicit consideration of each of the . . . *Windham* factors"]; *Windham*, at p. 129, fn. 6 [order denying a motion for self-representation based on nonconstitutional grounds need only "afford[ ] an adequate basis on which to determine the merits of a claim that the ruling was an abuse of discretion"].)  The trial court may also consider whether the defendant would need a continuance.  (*Windham*, p. 128, fn. 5.)  "'If the motion is untimely . . . the defendant has the burden of justifying the delay.'"  (*People v. Valdez* (2004) 32 Cal.4th 73, 102 (*Valdez*); see *People v. Horton* (1995) 11 Cal.4th 1068, 1110; *Windham*, at p. 128, fn. 5 [defendant must make "some showing of reasonable cause for the lateness of the request"].)  "Because the right to counsel is self-executing and persists unless the defendant affirmatively waives the right, the court must indulge every reasonable inference against such a waiver."  (*People v. Boyce* (2014) 59 Cal.4th 672, 703; see *People v. Burgener* (2016) 1 Cal.5th 461, 471.)

The Supreme Court has not articulated the standard of review for determining whether a defendant's request for self-representation is timely. (See *Johnson*, *supra*, 8 Cal.5th at p. 501 ["We did not articulate in *Lynch* what standard a reviewing court should apply in determining whether a defendant's request for self-representation is timely."].) Tyner argues our review should be de novo, but he cites a case where the defendant's request was admittedly timely. (See *People v. Stanley* (2006) 39 Cal.4th 913, 932.) The People do not take a position on the standard of review. Under any standard, however, Tyner's request was untimely. We review for abuse of discretion the trial court's order denying Tyner's untimely (and thus nonconstitutional) motion for self-representation. (*Thomas*, *supra*, 14 Cal.5th at p. 399.)

3.      *All Three Motions Were Untimely*

Tyner asserts that his first motion was timely because "it was made before the jury selection" and that he made it at "the first available opportunity [he] had for making such a motion in front of the trial judge." The first assertion is contrary to California law; the second is factually inaccurate and legally irrelevant.

To support his first assertion, Tyner cites *Avila v. Roe* (9th Cir. 2002) 298 F.3d 750 and *People v. Herrera* (1980) 104 Cal.App.3d 167 for the proposition his first motion was timely because he made it before jury selection. Neither case supports Tyner. In *Avila* the United States Court of Appeals for the Ninth Circuit stated, "In this circuit, a *Faretta* request is timely if made before jury impanelment, 'unless it is shown to be a tactic to secure delay.'" (*Avila*, at p. 753.) But that is not the law in California. In *Johnson*, *supra*, 8 Cal.5th 475 the

California Supreme Court acknowledged that "most federal courts have concluded that a *Faretta* motion is timely as a matter of law if it is made before trial, unless the motion is made for the purpose of delay," but the Supreme Court in *Johnson* rejected any such "bright-line rule" for California, observing many states have adopted a timeliness test consistent with *Lynch*. (*Johnson*, at p. 502; see *Avila*, at p. 753, fn. 3 [acknowledging the "California Supreme Court has articulated a different rule: under California law, a *Faretta* motion is considered timely if made a reasonable time before trial"].) Under *Lynch*, as stated, the trial court considers the totality of the circumstances in determining whether a *Faretta* motion is timely. (See *Johnson*, at p. 500; *Lynch*, *supra*, 50 Cal.4th at p. 726.) The Supreme Court in *Johnson* also observed California cases have held "'on numerous occasions that *Faretta* motions made on the eve of trial are untimely.'" (*Johnson*, at pp. 499-500 [citing five Supreme Court cases, including *Valdez*, *supra*, 32 Cal.4th at p. 102 ("*Faretta* motion made 'moments before jury selection was set to begin'" was untimely) and *People v. Horton*, *supra*, 11 Cal.4th at p. 1110 (*Faretta* motion made on the date scheduled for trial was untimely)].) In *Herrera*, the other case Tyner cites, the defendant's motion, made the morning of trial, did not, unlike Tyner's motion, include a request to continue the trial. (See *Herrera*, at pp. 174-175.) And *Herrera* predated by several decades the California Supreme Court's more recent decisions addressing the timeliness of *Faretta* motions.

Tyner did not make his first motion in a reasonable time before the scheduled trial date. Indeed, prospective jurors were waiting in the hallway. (See *Valdez*, *supra*, 32 Cal.4th at p. 102 [*Faretta* motion was untimely where the defendant asserted his

20

right to represent himself on the verge of jury selection].) In addition, counsel were ready to proceed with the trial, the case was scheduled to last two to three weeks and include numerous witnesses, and Tyner had many earlier opportunities to assert his right to self-representation. (See *Johnson*, *supra*, 8 Cal.5th at p. 500; *Lynch*, *supra*, 50 Cal.4th at p. 726.) And Tyner requested a continuance to prepare for trial. (See *Johnson*, at p. 501 [defendant's statement he needed "'considerable time'" to prepare for trial supported the trial court's ruling the defendant's *Faretta* motion was untimely].) Under these circumstances, the trial court did not err in ruling Tyner's first motion was untimely.

Regarding Tyner's second assertion (on his first motion), Tyner had numerous opportunities to assert his right to self-representation before the first day of trial. Tyner first appeared with Sario as appointed counsel on June 1, 2021, over 15 months before the trial began. Tyner admitted Sario told him to "'go pro per'" the first time Tyner asked Sario for a copy of the discovery, which had to have been before the pretrial hearing on September 30, 2021, when Tyner told Judge Sortino he had asked Sario for the discovery. That was almost a year before Tyner asked to represent himself. Moreover, as early as July 14, 2022 Tyner knew trial was scheduled to begin on September 6, 2022. Although the July 14, 2022 hearing was before Judge Sortino, Tyner previously appeared before Judge Camacho on April 13, 2022, when the court scheduled trial to begin by the end of July 2022. And nothing prevented Tyner from asserting his right before Judge Sortino or any judge other than the eventual trial judge. (See *Valdez*, *supra*, 32 Cal.4th at p. 102 [defendant could have made a valid *Faretta* motion to the judge presiding over a pretrial conference]; *People v. Stringer* (2019) 41 Cal.App.5th 974,

21

991 [*Faretta* motion was untimely where, among other reasons, the defendant did not make a request to represent himself "at any of the many pretrial proceedings he attended"]; see also *People v. Wycoff* (2021) 12 Cal.5th 58, 78 [judge presiding over pretrial proceedings granted the defendant's motion under *Faretta*].)

Regarding Tyner's second motion, Tyner argues it was timely because he told the court he no longer needed a trial continuance. But in *Thomas*, *supra*, 14 Cal.5th 327 the Supreme Court stated, "We have repeatedly held that a *Faretta* motion made on the eve of trial . . . is untimely, without regard to whether the defendant requested a continuance." (*Id.* at p. 398; see *People v. Bloom* (2022) 12 Cal.5th 1008, 1057 [rejecting the argument that "even a belated [*Faretta*] request must be granted unless it would entail undue delay or interfere with the orderly administration of justice"].) And, as discussed, the totality of circumstances supported the trial court's ruling Tyner's second motion was untimely.

Finally, in denying Tyner's third motion, the trial court did not make a finding it was untimely; the court instead denied the motion because it was not unequivocal. The record, however, establishes Tyner's third request was also untimely for the same reasons the first two motions were untimely. (See *Lynch*, *supra*, 50 Cal.4th at p. 728 [two *Faretta* motions made three weeks apart were both untimely]; see also *People v. Boyce*, *supra*, 59 Cal.4th at p. 703 [a reviewing court may affirm a ruling denying defendant's *Faretta* motion where the motion was properly denied on any ground].)

4. *The Trial Court Did Not Abuse Its Discretion in Denying Tyner's Untimely Requests To Represent Himself*

Because all of Tyner's motions to represent himself were untimely, we determine only whether the trial court abused its discretion in denying them. (See *Frazier*, *supra*, 16 Cal.5th at p. 852; *Thomas*, *supra*, 14 Cal.5th at p. 397.) It did not.

In denying Tyner's first motion to represent himself the trial court found that Tyner was seeking to delay the trial, that he could have asserted his right to self-representation earlier, and that Sario was a capable advocate. The court also considered whether Tyner had made a *Faretta* or *Marsden* motion in the past (he had not) and whether Tyner requested a continuance to prepare for trial (he did). Tyner said he did not ask to represent himself earlier because he did not know his trial was beginning that day, which, as discussed, was contrary to evidence Tyner knew the trial was going to begin September 12, 2022 at the latest. Tyner faults the trial court for failing to acknowledge it had discretion to grant Tyner's request even if the request was untimely. But the trial court considered all the *Windham* factors (with the possible exception of the length of the proceedings, which the court had acknowledged earlier that morning was two to three weeks). Thus, the record supports the trial court's explicit or implicit consideration of the *Windham* factors. (See *People v. Marshall*, *supra*, 13 Cal.4th at p. 828; *Windham*, *supra*, 19 Cal.3d at p. 129, fn. 6.)

In denying Tyner's second motion the trial court acknowledged it had discretion to grant Tyner's motion despite its untimeliness. Considering the reason for Tyner's request, the court found it arose from frustration stemming from Tyner's

23

inability to get a copy of the discovery.  Rather than address that justification (which the record supports), Tyner argues the trial court improperly considered several other factors, such as Tyner's frustration from failed plea negotiations and his limited access to electronic discovery and other resources while in custody.  But those were not the bases for the court's decision.  A court may deny a "motion for self-representation made in passing anger or frustration." (*People v. Marshall* (1997) 15 Cal.4th 1, 23; see *People v. Burgener*, *supra*, 1 Cal.5th at p. 471.)  The court did not abuse its discretion in denying Tyner's untimely (second) motion based on his frustration in not getting access to the discovery.

In denying Tyner's third motion the trial court found Tyner's request was equivocal because Tyner suggested he might need co-counsel or standby counsel.  Tyner argues the trial court abused its discretion in failing to exercise its discretion to appoint standby counsel.  That argument relies on a court's obligation in a capital case (which this is not) to consider a defendant's request for standby or advisory counsel *after* the court has granted a request for self-representation.  (See *People v. Bigelow* (1984) 37 Cal.3d 731, 745-746 [self-represented defendant in a capital case is entitled to "a conscientious exercise of judicial discretion on the appointment of advisory counsel"]; *People v. Garcia* (2000) 78 Cal.App.4th 1422, 1428-1431 [trial court has the option to appoint advisory counsel in noncapital cases, but its ruling is not subject to appellate review; the trial court cannot abuse its discretion in denying a request for advisory counsel in noncapital case].)  *Windham* and its progeny do not require a trial court, in exercising its discretion on a motion for self-representation in a non-capital case, to consider whether it might grant a future request for advisory counsel.  As *Windham* requires, the trial

24

court considered Tyner's reasons for his request and found, within its discretion, Tyner did not truly want to represent himself.

Moreover, during the hearing on Tyner's third motion Tyner also moved twice under Code of Civil Procedure section 170.6 to assign his case to another judge and stated he had a conflict of interest with his attorney. Those actions and statements further support the trial court's ruling denying Tyner's request as equivocal and as an attempt to disrupt or delay the proceedings. (See *Frazier*, *supra*, 16 Cal.5th at p. 852 [trial court did not abuse its discretion in denying an untimely motion for self-representation where the defendant intermingled *Faretta* and *Marsden* motions]; *People v. Stanley*, *supra*, 39 Cal.4th at p. 933 [interposed requests for self-representation and *Marsden* motions made "out of apparent annoyance or frustration" did not demonstrate unequivocal request for self-representation].)

Tyner also argues the trial court infringed on his right to counsel by attempting to condition approval of his request on his agreement to waive his right to appeal. Tyner cites no support for this contention and, in any event, the court did not deny Tyner's request because he would not agree to waive his appellate rights.

      B.    *Tyner Has Not Shown His Counsel Provided Ineffective Assistance*

      1.    *Applicable Law*

"To prevail on an ineffective assistance of counsel claim, a criminal defendant must establish both that his or her counsel's

performance was deficient and that the deficient performance prejudiced the defense.  [Citation.]  The deficient performance component of an ineffective assistance of counsel claim requires a showing that 'counsel's representation fell below an objective standard of reasonableness' under prevailing professional norms.  [Citation.]  'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."'"  (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 211-212 (*Ramirez*); see *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Bell* (2019) 7 Cal.5th 70, 125.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009; see *Ramirez, supra*, 98 Cal.App.5th at p. 212.)  "[W]e begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.'  [Citation.]  Accordingly, we have characterized [a] defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission."  (*People v. Mickel* (2016) 2 Cal.5th 181, 198; *Ramirez*, at p. 212.)

"Regarding prejudice, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'  [Citation.]  'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [Citation.]  'A defendant must prove prejudice that is a "'demonstrable reality,' not simply speculation."'"  (*Ramirez*, *supra*, 98 Cal.App.5th at p. 212; see *Strickland*, *supra*, 466 U.S. at p. 694; *People v. Bell*, *supra*, 7 Cal.5th at p. 125.)  "Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant, are mixed questions of law and fact subject to our independent review."  (*In re Gay* (2020) 8 Cal.5th 1059, 1073; see *In re Thomas* (2006) 37 Cal.4th 1249, 1256.)

2.      *Counsel for Tyner Did Not Provide Ineffective Assistance by Failing To Present Evidence Supporting a Theory of Voluntary Manslaughter or Second Degree Murder*

a.      *Relevant Proceedings*

The court discussed jury instructions with counsel several times during trial.  Regarding instructions for the lesser included offense of voluntary manslaughter, the court stated the nature of the wounds inflicted on Wall were "consistent with an act of rage and uncontrollable behavior."  Sario agreed and asked for a voluntary manslaughter instruction.  The prosecutor conceded there was evidence of "rage" and "anger," but he argued there was "not a single, itsy-bitsy, teeny bit" of evidence of provocation.  Instead, the prosecutor stated, Tyner said that he was not at Wall's apartment when she was killed and that he and Wall got

27

along well.  The court said it "tend[ed] to agree" with the prosecutor that there had to be some evidence of provocation beyond the nature of the offense and the choice of weapon (i.e., a "readily available" item inside the apartment, which "detracts from a premeditated type of decision") and that there was no such evidence in the trial so far.  The court said it would return to the issue after all the evidence had been received.  The court similarly postponed considering whether to give CALCRIM No. 522 on the effect of provocation on the degree of murder until the end of the evidentiary portion of the trial.

After the People indicated they were ready to rest their case and Tyner decided against testifying, the court stated it had "eliminated any reference to voluntary manslaughter as a lesser offense" from the jury instructions.  The court explained "there is zero evidence of adequate provocation to invoke sufficient heat of passion necessary to negate malice."  The court stated it also eliminated any reference to provocation that could reduce first degree murder to second degree murder.

During closing argument Sario argued Tyner was not at Wall's apartment when she was murdered and was "not responsible" for Wall's murder.  Sario also characterized Wall's murder as a "crime of passion" committed without careful consideration or premeditation.  But he never argued Tyner was provoked into killing Wall.  Instead, Sario argued the People provided no evidence of motive, which tended to show Tyner was not guilty.

After the verdict Tyner retained new counsel, who filed a motion for a new trial.  Tyner argued Sario provided ineffective assistance by failing to present evidence that would have required the trial court to instruct the jury on voluntary

28

manslaughter. In particular, Tyner argued Sario should have called as witnesses Robert Cobos and Eli Shapiro, two of Wall's neighbors the police interviewed after the murder. Cobos told police he heard a "loud commotion" coming from Wall's apartment at approximately 7:05 p.m. on Sunday, March 17, 2019. He described the commotion as "furniture and bodies hitting the wall." The only words he heard were from a female voice saying, "I love you." He said he could hear another voice, but he could not tell if it was a male or female voice. Shapiro told police he "frequently" heard loud noises coming from Wall's apartment. He said he heard "loud talking from a male and a female" at about 11:00 p.m. on March 17, 2019. He said that the loud talking continued after midnight, when he fell asleep, and that he did not hear anything else until the smoke alarm sounded the next morning.

The People opposed the motion for a new trial and argued Sario's decisions not to call Cobos and Shapiro were tactical or unavoidable. Regarding Cobos's potential testimony, the People pointed out Cobos could not have heard a woman's voice on Sunday, March 17, 2019 because Wall was killed on Saturday, March 16, 2019. The People also argued Cobos's statement he heard a woman say "I love you" implicated Tyner, who was Wall's boyfriend at the time she was killed.[6] Thus, the People argued, Sario's decision not to call Cobos as a defense witness was a "wise tactical decision." The People also said they did not call Cobos as a prosecution witness because they could not locate him at the

---

[6]      The People's opposition to the motion for a new trial included Cobos's testimony from Tyner's preliminary hearing that he heard a woman say, "I still love you" instead of simply, "I love you."

time of trial.  Regarding Shapiro, the People argued he also mistakenly told the police that he heard noises in Wall's apartment on March 17, 2019 instead of March 16 and that he might have heard the television or Tyner talking on the phone on the night of March 17.  Either way, the People argued, Sario's decision not to call Shapiro was reasonable.[7]  The trial court denied Tyner's motion for a new trial.

> b. *Tyner Cannot Show There Was No Satisfactory Explanation for Sario's Decisions*

Tyner argues "[n]o sound trial strategy existed to justify" Sario's decisions not to present the statements or testimony of Cobos and Shapiro, "especially in light of counsel's argument to the jury that this was a crime of passion and not a deliberate and premeditated murder."  Tyner contends, as he did in the trial court, evidence from Cobos and Shapiro would have required the trial court to instruct the jury on voluntary manslaughter and with CALCRIM No. 522 on the effect of provocation on the degree of murder.  The People argue Sario's decision not to present evidence to support a theory of voluntary manslaughter or second degree murder was rational because those theories contradicted Tyner's statements to police that he was not in Wall's apartment when she was killed and that he did not kill Wall.  Tyner

---

[7]     The People stated they did not call Shapiro as a prosecution witness because he was 86 years old at the time of the trial in 2022 and he told a deputy district attorney he would not go to court and risk getting COVID.  Shapiro also said he would not comply with a subpoena.  Thus, the People argued, Shapiro was unavailable to testify.

contends Sario could have argued Tyner killed Wall in the heat of passion or with provocation "without undermining Tyner's statements to police that he did not commit the crimes."

Choosing not to present the jury with contradictory theories of events is a rational tactical decision. (See, e.g., *People v. Wader* (1993) 5 Cal.4th 610, 643 [defense counsel had a rational tactical reason for not requesting an instruction on intoxication, which would have negated the defendant's specific intent to kill, when defendant said he intended only to scare the victim when he shot her]; *People v. Diaz* (2023) 97 Cal.App.5th 1172, 1181-1182 [defense counsel had a rational tactical reason for not requesting an instruction on provocation, where the defendant's theory was misidentification]; *People v. Windfield* (2021) 59 Cal.App.5th 496, 520-521 [defense counsel had a rational tactical reason for not requesting an instruction on provocation, where the defendant's theory was that "someone else may have shot" the victim]; *People v. Olivas* (2016) 248 Cal.App.4th 758, 771 [defense counsel had a rational tactical reason for not requesting an instruction on intoxication in connection with charge for sexual misconduct, where "the primary defense theory was that no misconduct occurred"].) Thus, there is a satisfactory explanation for Sario's decision not to call Cobos or Shapiro as a defense witness (or otherwise to attempt to introduce their statements to police or Cobos's preliminary hearing testimony). To be provoked, Tyner had to be in Wall's apartment and had to be provoked into killing her. His defense was that the People failed to prove he was there and that, even if he was there, the People failed to show he had any motive to kill Wall. Sario could have presented evidence from Cobos and Shapiro and argued the evidence supported voluntary

31

manslaughter or second degree murder, but "to do so risk[ed] incredulity from jurors." (*Diaz*, at p. 1182.)[8]

Moreover, introducing testimony from Cobos that Wall told Tyner just before her death she loved him could have backfired by making Tyner out to be a ruthless and heartless killer. (See *People v. Diaz, supra*, 97 Cal.App.5th at p. 1182 [defense counsel rationally avoided testimony that "could spark jury indignation"].) And Shapiro's statement he heard "loud talking" on March 17 (or March 16) was unremarkable in light of his statement he "frequently" heard loud noises coming from Wall's apartment. Thus, Sario had a rational tactical reason for not presenting evidence from Cobos and Shapiro that would contradict Tyner's version of events.

> 3. *Sario's Failures To Object to the Prosecution's Closing Argument Does Not Demonstrate Ineffective Assistance on Direct Appeal*

> a. *Relevant Proceedings*

Tyner argues the prosecutor committed prosecutorial misconduct by appealing to the jury's sympathies and by referring to Tyner's demeanor in closing arguments. First, Tyner contends the prosecutor appealed to the emotions and passions of the jury by "sobbing or crying" during closing argument and by reciting song lyrics that encouraged the jury to view the murder

---

[8] Because Sario's performance was not deficient, we do not consider whether hypothetical testimony from Cobos and Shapiro that reiterated their statements to police would have required the court to instruct the jury on voluntary manslaughter or provocation under CALCRIM No. 522.

through the eyes of the victim. The prosecutor said Wall "didn't die in silence. She still speaks to us." The prosecutor said he couldn't help thinking about Wall and remarked, when he became tearful, "I'm not doing this intentionally."[9] The prosecutor then quoted lyrics from the song "Goner" by Twenty One Pilots, which the prosecutor said he heard in his car the day before. The prosecutor said: "The song has words that tied in with this case . . . . It starts out with saying 'I'm a goner.' I didn't know Ronnie [Wall]. 'I'm a goner. Somebody catch my breath. I'm a goner. Somebody catch my breath. I want to be known by you. I want to be known by you.' The chorus reads, 'and though I'm weak and beaten down, I will slip away into the sand. The ghost of you is close to me. I'm inside out. You're underneath.' Second verse. 'I've got two faces, blurry is the one I'm not.' This is not who she is. This is who she is. 'I've got two faces, blurry is the one I'm not. I need your help to take him out. I need your help to take him out. Don't let me be gone. Don't let me be gone.'" The prosecutor then said this case is about "justice for Ronnie and your understanding down in your soul that you have knowledge and evidence to believe that [Tyner] is guilty beyond any doubt." Sario did not object.

Second, Tyner argues the prosecutor impermissibly commented on Tyner's demeanor in the jury's presence. During his closing argument the prosecutor said, "People have dark sides." He read from a transcript of Tyner's police interview

---

[9] In their opposition to Tyner's motion for a new trial the People stated the prosecutor "teared up and was unable to speak for a moment," but he did not sob or cry. The trial transcript does not indicate whether the prosecutor sobbed, cried, or simply teared up.

where a police officer said, in an apparent attempt to "rile up" Tyner, "'You're just a bootie call, dude.'" Tyner told the officer, "'I wasn't a bootie call. She didn't dump me. She wasn't breaking up with me. She's a 60-year-old woman.'" The prosecutor told the jury: "When that issue came up in court, [Tyner] laughed. Now, pause for a second. Think about that for a moment. . . . He is the defendant in the case with the context [Wall] was badly murdered. . . . You're here to judge the evidence in the case, and in court he laughs. There is a dark side. . . . He does not like being disrespected. That gives you some insight into motive." Again, Sario did not object.

b.  *Sario's Failures To Object Did Not Render His Assistance Ineffective*

A prosecutor may not use arguments giving the jury the impression that "emotion may reign over reason" or inviting an "irrational, purely subjective response." (*People v. Leon* (2015) 61 Cal.4th 569, 605-606, internal quotation marks omitted; see *People v. Linton* (2013) 56 Cal.4th 1146, 1210.) "'As a general rule, a prosecutor may not invite the jury to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim.' It is also improper to ask jurors to imagine the victim's thoughts during the last seconds of life." (*Leon*, at p. 606; see *People v. Leonard* (2007) 40 Cal.4th 1370, 1406-1407.) A prosecutor also "may not comment on a defendant's demeanor or behavior during the guilt phase [of a capital trial] unless it is to tell the jury to ignore a defendant's demeanor or behavior." (*People v. Houston* (2012) 54 Cal.4th 1186, 1223; see *People v. Boyette* (2002) 29 Cal.4th 381, 434.) At least one court has called the use of such comments "imprudent"

in a non-capital trial.  (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1201.)

Failing to object to improper arguments, however, "'rarely constitutes constitutionally ineffective legal representation.'" (*People v. Gray* (2005) 37 Cal.4th 168, 207; see *People v. Ramirez* (2022) 79 Cal.App.5th 48, 58.)  "'[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.'" (*People v. Ramirez*, at p. 58; see *People v. Arredondo* (2019) 8 Cal.5th 694, 711.)  And, as stated, courts on direct appeal regularly reject claims of ineffective assistance of counsel based on failing to object where the record sheds no light on why trial counsel for the defendant did not object or request an admonition.  (See *People v. Caro* (2019) 7 Cal.5th 463, 514.)

The record does not disclose why Sario did not object to the prosecutor's arguably improper comments and conduct.  Tyner's motion for a new trial included a declaration from Sario, but it stated only that (but not why) Sario did not object when the prosecutor quoted the song lyrics and (in Sario's words) "began openly crying in front of the jury."  But Sario reasonably could have concluded that objecting to the prosecutor's arguments would draw "undue attention" to them.  (*People v. Ramirez*, *supra*, 79 Cal.App.5th at p. 61; see *ibid.* [no ineffective assistance of counsel where counsel's failure to object could be explained as a tactical decision not to draw the jurors' attention to comments by the prosecutor]; see also *People v. Huggins* (2006) 38 Cal.4th 175, 206 ["counsel could have preferred not to draw the jurors' attention to particular comments by the prosecutor by objecting to them"].)  We will not assume on direct appeal Sario's failure to object to the prosecution's arguments rendered his assistance ineffective.  (See *People v. Ramirez*, at p. 61.)

But even if Sario's performance was deficient, Tyner has not established prejudice. Tyner argues that the prosecutor "used Tyner's courtroom demeanor to portray him as having a 'dark side' and seeing himself as more than the victim and therefore having a motive to kill" Wall and that "quoting emotional song lyrics while crying or sobbing before the jury and urging the jurors to give justice to the victim" compounded the prejudice. But the evidence against Tyner was overwhelming. Granted, the evidence was circumstantial, but it consisted of surveillance video and cell phone data showing Tyner with Wall at or near her apartment building throughout the weekend of March 16-17, 2019, DNA evidence showing Tyner handled the murder weapon, evidence showing Wall had Tyner's DNA under her fingernails, Tyner's bloodied white jeans among the materials used to start a fire, statements from residents of Tyner's group home undermining his alibi, multiple inconsistent statements concerning where Tyner was that weekend and the source of his injuries, and the location of Wall's stolen car. There is no reasonable probability that, but for the prosecutor's quotes from "Goner" and statements about Tyner's "dark side" (admittedly somewhat questionable conduct by a prosecutor), the result of the trial would have been different. (See *People v. Delgado* (2013) 56 Cal.4th 480, 484 [strong circumstantial evidence precluded finding of prejudice]; *People v. Turner* (1990) 50 Cal.3d 668, 699 [given "strong circumstantial evidence" and "the inherent implausibility of much of defendant's version of events" there was no substantial probability the trial outcome was affected].)

Tyner contends his case was not "open and shut" because the jury asked to see his military discharge records showing he was discharged for being absent without leave. Tyner introduced

36

those records to rebut testimony from a witness that Tyner was discharged for throwing a person out a window. Tyner does not explain, however, how the jury's interest in records showing a nonviolent reason for his discharge undermined the strength of the evidence against him.[10]

## DISPOSITION

The judgment is affirmed.

SEGAL, J.

We concur:

MARTINEZ, P. J.

STONE, J.

---

[10]  Because the trial court did not err in denying Tyner's motions to represent himself and Tyner has not demonstrated ineffective assistance of counsel, we do not consider Tyner's argument the cumulative effect of the alleged errors resulted in a miscarriage of justice or denied him a fair trial.